**Jedidiah Issac MURPHY, Appellant,**

v.

**The STATE of Texas.**

**No. 74145.**

Court of Criminal Appeals of Texas, En Banc.

June 25, 2003.

Rehearing Denied Sept. 10, 2003.

Adam L. Seidel, Dallas, for Appellant.

Lisa Braxton Smith, Asst. DA, Dallas, Matthew Paul, State's Atty., Austin, for State.

### *OPINION*

HOLCOMB, J., delivered the opinion of the Court, in which MEYERS, PRICE, KEASLER, and HERVEY, JJ., joined.

Appellant was convicted in June 2001 of capital murder. TEX. PENAL CODE ANN. § 19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071 § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071 § 2(h). Appellant raises twenty points of error. We affirm.

1. Unless otherwise indicated, all references to articles refer to those in the Texas Code of Criminal Procedure.

In his first point of error, appellant claims the trial court violated his rights under the Sixth Amendment to the United States Constitution by limiting his voir dire questioning pertaining to the State's burden of proving beyond a reasonable doubt that appellant posed a future danger. In a pretrial hearing, appellant sought permission from the trial court to ask prospective jurors the following two questions:

Would victim character testimony cause you to reduce the State's burden of proof on Special Issue Number 1?

Do you promise the Court that you would not do so?

The State objected on the ground that the questions sought commitments from the jurors. The court sustained the State's objection. Appellant argues that his questions simply inquired whether prospective jurors would hold the State to its burden of proof notwithstanding the presence of evidence of the victim's character.

A trial court has broad discretion over voir dire, including the propriety of particular questions. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex.Crim.App.2002). A trial court's discretion is abused only when a proper question about a proper area of inquiry is prohibited. *Id.*

The trial court did not abuse its discretion in disallowing the questions. Appellant did not state how "victim character testimony" would be defined nor did he state whether or not venirepersons would be informed of this area of law before being asked such questions. *Cf. Chambers v. State*, 903 S.W.2d 21, 29 (Tex.Crim.App.1995)(stating venireperson not shown biased or prejudiced against the law unless the law is first explained to them). A proper explanation of the law is essential before asking a question upon which a challenge for cause due to bias against the law might be based. *See id.*

Prospective jurors would need to be informed that the standard of proof by which the State must prove its case remains constant; it may not be increased or reduced depending upon the presentation of a certain type of evidence. In addition, because the standard of proof by which the State must prove its case is not affected by the presentation of any certain type of evidence, the trial court could reasonably have concluded that the questions would be confusing or misleading. Point of error one is overruled.

In his second point of error, appellant asserts the same argument he made in point of error one under Article I, Section 10 of the Texas Constitution. However, because appellant does not argue that the Texas Constitution provides, or should provide, greater or different protection than its federal counterpart, appellant's point of error is inadequately briefed. *See Heitman v. State*, 815 S.W.2d 681 (Tex. Crim.App.1991). Point of error two is overruled.

In his third and fourth points of error, appellant claims the trial court abused its discretion by granting the State's challenge for cause against venireperson Alena Treat, in violation of Article 35.16 and the Fourteenth Amendment to the United States Constitution. The trial court granted the State's challenge for cause against Treat on the ground that she would require proof of another murder or attempted murder before finding appellant would commit criminal acts of violence that would pose a continuing threat to society. Appellant relies on the reasoning in *Garrett v. State*, 851 S.W.2d 853, 859 (Tex. Crim.App.1996), and cites *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), to argue that Treat's views about the death penalty would not have prevented or substantially impaired

her ability to follow the court's instructions or the law and her juror's oath.

During voir dire, Treat stated that her understanding of the phrase "criminal acts of violence" meant "the same type of crime" as the capital murder that the defendant would have been convicted of in the guilt phase. Treat maintained that the State would have to prove that the defendant would commit or attempt to commit another murder in order to prove future dangerousness. When questioned by the trial court, Treat stated that intentionally causing a person to become mentally disabled by giving them a drug that would put them into a coma would also rise to the level of a criminal act of violence but conceded later that even these circumstances essentially amounted to an attempted murder.

In *Fuller v. State*, 829 S.W.2d 191, 200 (Tex.Crim.App.1992), *cert. denied,* 508 U.S. 941, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993), the venireperson was challenged for cause on the ground that she would consider imposing capital punishment for serial murderers only. We said that "[b]ecause our law does not categorically reserve capital punishment only for those who have murdered before, neither may individual jurors in a capital murder case." We accordingly held that under these circumstances, the trial court did not abuse its discretion in granting the State's challenge for cause. *Id.* at 201.

In *Garrett,* 851 S.W.2d at 859, the trial court granted the State's challenge for cause against a venireperson who testified that he could never answer the future dangerousness issue affirmatively based solely on the facts of the capital offense. The venireperson was struck for harboring a bias or prejudice against the law upon which the State was entitled to rely. We reversed, explaining that each juror must decide for himself what amount of proof would constitute the threshold of beyond a reasonable doubt:

[T]hat the law permits jurors to find future dangerousness in some cases on the facts of the offense alone does not mean that *all* jurors must do so, or even consider doing so. A particular juror's understanding of proof beyond a reasonable doubt may lead him to require more than the legal threshold of sufficient evidence to answer the second special issue affirmatively. There is nothing unlawful about that; in fact, quite the opposite. As the trial judge himself explained to Bradley early in his voir dire, *an individual juror must determine what proof beyond a reasonable doubt means to him, for the law does not tell him[.]* ... That an individual venireman would set his threshold higher than the minimum required to sustain a jury verdict does not indicate he has a bias or prejudice against the law.

*Id.* (emphasis added and footnotes and citations omitted).

In *Rachal v. State,* 917 S.W.2d 799, 811 (Tex.Crim.App.)(plurality opinion), *cert. denied,* 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 539 (1996), two venirepersons were challenged for cause by the State. Venireperson Terrell testified that even if she believed beyond a reasonable doubt that the State had proved future dangerousness, she would not answer the issue affirmatively unless the State also presented evidence that the defendant had a prior felony conviction. *Id.* Venireperson Adams testified that even if convinced beyond a reasonable doubt that the defendant would be a future danger, he would nevertheless require evidence that the defendant would kill another human being before he would answer the issue affirmatively. The defendant conceded that under *Fuller,* the venirepersons were properly challenged, but argued that *Fuller* had

been overturned by *Garrett.* A plurality of the Court disagreed, holding that *Fuller* controlled and *Garrett* was distinguishable. *Id.* at 811.

■ A year later, a majority of the Court in *Howard v. State,* 941 S.W.2d 102, 129 (Tex.Crim.App.1996)(op. on reh'g), *cert. denied,* 535 U.S. 1065 (2002), reaffirmed the reasoning in *Garrett,* holding that: [2]

> A venireman who requires evidence of a prior murder has not demonstrated an inability to abide by the law if his requirement is predicated upon his personal threshold of reasonable doubt. The State must show more, *viz:* that the venireman's insistence on evidence of a prior murder will prevent him from honestly answering the special issue *regardless* of whether he was otherwise convinced beyond a reasonable doubt of future dangerousness, before it can be said it has met its burden to demonstrate the venireman cannot follow the law.

*Id.* Thus, under *Howard,* it is plain that prospective jurors may form their own definitions of proof beyond a reasonable doubt and they are not challengeable for cause based upon the type and amount of evidence they require to reach that level of confidence. *Id.* at 127. Only if the venireperson would refuse to answer the issue "yes" unless a certain type of evidence is presented, even if the other evidence presented were sufficient to convince them of the special issue beyond a reasonable doubt, would the venireperson be challengeable for cause. *Id.* Accordingly, the trial court erred in granting the State's challenge for cause against Treat. Treat was entitled to determine for herself what future dangerousness meant to her. That she would require a murder or attempted murder did not render her challengeable for cause. *Id.*

■ But Treat's exclusion from the jury may not necessarily be cause for reversal. *See Cain v. State,* 947 S.W.2d 262, 264 (Tex.Crim.App.1997)(stating that except for certain federal constitutional errors labeled by United States Supreme Court as "structural," no error is categorically immune to harmless error analysis). Appellant claims Treat's erroneous exclusion violates Article 35.16, *Witherspoon,* and the Fourteenth Amendment. As to appellant's Article 35.16 claim, appellant must show that the erroneously granted challenge for cause deprived him of a lawfully constituted jury. *Feldman v. State,* 71 S.W.3d 738, 749 (Tex.Crim.App.2002); *Brooks v. State,* 990 S.W.2d 278, 289 (Tex.Crim.App.), *cert. denied,* 528 U.S. 956, 120 S.Ct. 384, 145 L.Ed.2d 300 (1999); *Jones v. State,* 982 S.W.2d 386, 394 (Tex.Crim.App.1998), *cert. denied,* 528 U.S. 985, 120 S.Ct. 444, 145 L.Ed.2d 362 (1999). He has made no such showing here. Point of error three is overruled.

■ *Witherspoon* error, however, is not subject to a harm analysis under *Jones,* 982 S.W.2d at 391. We stated in *Jones* that, "[o]nly in very limited circumstances, when a juror is erroneously excluded because of general opposition to the death penalty" (*Witherspoon* error), "does the exclusion of a juror by an unintentional mistake amount to a constitutional viola-

---

**2.** In so holding, the Court in *Howard* noted the existence of other circumstances that justified the challenges against the venirepersons at issue in *Fuller* and *Rachal. Howard,* 941 S.W.2d at 128 (referring to venireperson's tendency to "pay heed to his own conception of what the law ought to be rather than follow the legal criteria" as justifying challenges for cause). *Howard,* 941 S.W.2d at 128. In addition, the venireperson in *Fuller* was not fully questioned so that it was "impossible to tell whether her own personal preference or bias would likely prevent her from following the law." *Id.* at n. 2.

tion." *Id.* Under *Witherspoon*, a venireperson would be excluded "only where they made it unmistakably clear they would automatically vote against the imposition of the death penalty, or where their attitude would preclude them from making an impartial determination of guilt or innocence." *Drinkard v. State*, 776 S.W.2d 181, 182 (Tex.Crim.App.1989). In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court abandoned *Witherspoon's* substantive standard and its burden of proof requirement. *Id.* *Wainwright* reaffirmed the *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), standard for determining when a veniremember may be excluded for cause due to his or her views on capital punishment, holding that the critical inquiry is "whether a juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* (discussing *Wainwright*, 469 U.S. at 424, 105 S.Ct. 844).

Treat was excluded in this case because her own definition of the phrase "criminal acts of violence" would require evidence that appellant committed or attempted to commit other murders. While the phrase at issue is embedded within our capital death penalty provision which itself is continually assessed for its ability to hold up against federal constitutional standards, the wrongful elimination of a juror for establishing her own definition of that phrase does not implicate *Witherspoon/Wainwright*. Treat harbored no general opposition to the death penalty. She was not excluded because her views on capital punishment in general would prevent or impair her performance. Point of error four is overruled.

In points of error five through eight, appellant claims the trial court erred by denying appellant's challenges for cause against four venirepersons. Appellant claims these venirepersons were all biased against the law and therefore his challenges for cause should have been granted.[3]

During the voir dire of venireperson Phillip Mays, defense counsel asked him about times when "the laws of man conflict with the laws of God, specifically the Ten Commandments." Pointing to Mays' statement that he was not sure where the two would conflict, but if they did, he would side with his religious beliefs, appellant concludes that Mays was therefore challengeable for cause on the ground that he would be impaired in his ability to follow the law.

Appellant failed to demonstrate that Mays was first informed that he would be required to take an oath that in the case of any conflict between the tenets of Mays' religion and the law on which Mays would be instructed, Mays would be required to follow the law. In the absence of a showing that Mays was fully informed as to the applicable law, appellant has failed to show that Mays was biased or prejudiced against the law. *See Curry v. State*, 910 S.W.2d 490, 493 (Tex.Crim.App.1995); *Chambers v. State*, 903 S.W.2d 21, 29 (Tex. Crim.App.1995).

Appellant claims venireperson John Robuck was challengeable for cause because he could not consider the full range of punishment. Appellant claims Robuck could not consider five years as a punishment for an intentional murder. But a review of the record reflects that when the trial court asked Robuck to consider some hypothetical scenarios in which five years might be an appropriate punishment, Ro-

---

**3.** We assume, without deciding, that appellant preserved his complaints for review.

buck agreed that he could consider five years and stated that it "completely depends on the circumstance[s]." Appellant has not shown that Robuck could not consider the full range of punishment for murder.

■ Appellant claims veniremembers Thomas Brooks and Kimberly Williams each equated the term "probability" of future dangerousness with "possibility." He complains that the trial court should have granted his challenges for cause against them on that basis.

During the State's voir dire, Brooks explained his understanding of the term "probability" as meaning "not definite." During questioning by defense counsel, Brooks explained that it meant "[i]t's not a definite thing." He stated that it was something that was "possible in the future" but that he could not "put a number on it." He stated it was "a chance." During Williams' voir dire by the State, Williams stated that "probability" meant "it's possible it could, or could have not." Upon further questioning, she agreed that it would have to be more than fifty percent chance on a scale of zero to one hundred. When questioned by defense counsel Williams reiterated that she would define probability as a possibility. When questioned about percentages by the trial court, Williams could not say. She continued to reiterate that she believed probability and possibility mean the same thing.

Appellant relies on *Hughes v. State,* 878 S.W.2d 142, 148 (Tex.Crim.App.1992), in which the Court reversed a conviction based upon an erroneous denial of a challenge for cause against a venireperson who equated the term "probability" with "possibility." We held:

[The venireperson's] answers during his voir dire indicate that he understood "probability" as any percent possibility rather than as a "likelihood" or "good

chance[.]" In its usual acceptation, a "probability" is something more than a "possibility." As this Court stated in *Smith[v. State],* 779 S.W.2d 417, 421, in which we relied on *Cuevas[ v. State,* 742 S.W.2d 331 (Tex.Crim.App.1987)], "we know that the second special issue calls for proof of more than a bare chance of future violence." Requiring more than a mere possibility that the defendant would commit criminal acts of violence and would constitute a continuing threat to society prevents the freakish and wanton assessment of the death penalty.

Since [the venireperson] understood "probability" as only a "possibility", he was properly challengeable for cause. We hold the trial court abused its discretion in denying appellant's challenge.

*Id.* (footnotes omitted).

Assuming Brooks' and Williams' understandings of the term probability was erroneous, appellant has not shown that he was entitled to strike them for cause. Although we have held that the term "probability" need not be defined, we have also held that the terms means "more than a mere possibility." *Id.* Further, it must be explained to the veniremember that the law requires him to see and accept the distinction between the terms as set forth in *Hughes.* Once explained the law, if the prospective jurors continue to insist upon an definition or understanding of the term that is inconsistent with *Hughes,* then they may be challengeable for cause. In these circumstances, where the law was not carefully or adequately explained to Williams and Brooks, the trial court did not abuse its discretion in denying appellant's challenges for cause. Points of error five through eight are overruled.

■ In point of error nine, appellant claims he was denied effective assistance of counsel, in violation of the Sixth

and Fourteenth Amendments to the United States Constitution, during voir dire, when his trial counsel used peremptory strikes against two venirepersons whom counsel erroneously believed he had unsuccessfully challenged for cause. Stating that his challenge for cause against venireperson Mark Colditz had been denied, defense counsel utilized a peremptory strike against him. But the record reflects that Colditz was not submitted for cause by appellant. Also erroneously stating his challenge for cause against venireperson John Wilson was denied, defense counsel exercised a peremptory strike against him.

In order to prevail on a claim of ineffective assistance of counsel, appellant must prove by a preponderance of the evidence (1) that counsel's performance was deficient; and (2) that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We have repeatedly stated that "[i]f counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal." *Ortiz v. State,* 93 S.W.3d 79, 88 (Tex.Crim.App.2002).

Despite appellant's counsel's mistaken belief about the challenges for cause, he may have ultimately utilized peremptory challenges against Wilson and Colditz for any number of legitimate reasons. As the State points out, review of their voir dire examinations reflects a number of issues that the defense might legitimately have found warranted peremptory strikes. For instance, Wilson had been a witness in a murder case after finding the body of an employee who was shot by a disgruntled fellow employee. Wilson was also a strong supporter of the death penalty and believed it should be available as a penalty for non-capital intentional murders. He had previously served on two criminal juries, both of which returned convictions. Finally, Wilson's father had an "extensive career" with the Dallas Police Department. Venireperson Colditz held opinions that might be viewed as unfavorable to the defense. He testified he would have a hard time considering alcohol, drug use, or even mental retardation to be mitigating evidence. He also stated initially that he would be "reluctant" to acquit for a failure to prove venue or for a *Miranda* violation, both of which were contested issues in the case. In light of this record, "there is at least the possibility" that counsel's use of peremptory strikes on Wilson and Colditz was reasonable trial strategy and accordingly, we defer to counsel's decision. *See id.* Point of error nine is overruled.

 In his tenth point of error, appellant claims this appeal should be abated until the trial court files findings of fact and conclusions of law as required by Article 38.22. Appellant filed pretrial motions seeking suppression of his oral and written statements on the ground that they were involuntarily made. The trial court held a hearing outside the jury's presence, but did not enter written findings of fact and conclusions of law regarding the admissibility of the statements. However, at the close of the hearing, the trial court dictated its findings and conclusions into the record. A trial court satisfies the requirements of Article 38.22 when it dictates its findings and conclusions to the court reporter, and they are transcribed and made a part of the statement of facts, filed with the district clerk and made a part of the appellate record. *Parr v. State,* 658 S.W.2d 620, 623 (Tex.Crim.App.1983); *see also Andrade v. State,* 6 S.W.3d 584, 592 (Tex.App.-Houston [14th Dist.] 1999, pet.

ref'd)(following *Parr*); *Lee v. State*, 964 S.W.2d 3, 11–12 (Tex.App.-Houston [1st Dist.] 1997, pet. ref'd)(following *Parr*); *Amunson v. State*, 928 S.W.2d 601, 608 (Tex.App.-San Antonio 1996, pet. ref'd)(following *Parr*). That has been done in this case. Point of error ten is overruled.

 In his eleventh point of error, appellant claims his rights pursuant to the Sixth Amendment of the United States Constitution were violated when the prosecutors examined letters and notes written by appellant to his trial attorneys which were protected by attorney-client privilege. Before trial, written materials, notes and letters, including three pages of handwritten notes to appellant's attorneys, were seized from appellant's jail cell by jail personnel after appellant attempted a suicide. The documents were viewed by prosecutors before trial. Appellant claims the seizure amounted to a knowing and unlawful intrusion of the attorney-client privilege by the State, and he is therefore entitled to a reversal.

During trial, the court held a hearing outside the presence of the jury. An employee of the Dallas County Sheriff's Department testified that pursuant to the customary practice of the Dallas County Jail in the case of an attempted suicide in jail, the cell is considered a crime scene and all evidence is confiscated. Both prosecutors in appellant's case testified that they reviewed the seized papers, but only one of the prosecutors testified that he reviewed portions of the three pages purportedly written to appellant's attorneys. At the top of Defense Exhibit 6A, is written, "Michael & Jane (Sorry if I've offended you by using your 1st names)." It was signed on the back, "Sincerely, Jim Ed." The prosecutor agreed that he knew appellant's attorneys were Michael Byck and Jane Little, and that Jim Ed was a name appellant was known to go by. Defense

Exhibit 6B, began "Questions for my lawyers" and was followed by six numbered paragraphs, and signed at the bottom by "Jim." Defense Exhibit 6C, stated on the back: "To my lawyers! Please help me with the problems I'm having, the staff sees me only as a monster." The other side began its narrative writing, "Michael...." Substantively, they pertain almost exclusively to appellant's desire to contact a psychiatrist to prescribe medication to stop his hallucinations and prevent him from "losing his mind." The prosecutor who reviewed the papers testified that he did not use any information contained in them in his prosecution of appellant. The trial court concluded that if there was any error, it was harmless beyond a reasonable doubt. The court did find, however, that Defense Exhibits 6A, 6B and 6C were attorney-client privileged, but questioned whether they were located "in a secure and confidential place."

 The State's intrusion into the attorney-client relationship violates a defendant's constitutional right to counsel when the defendant is prejudiced by the violation. *United States v. Morrison*, 449 U.S. 361, 365–66, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981); *Weatherford v. Bursey*, 429 U.S. 545, 555–59, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). The federal circuit courts of appeals are split on the issue of whether prejudice is presumed or must be proven. *Compare Briggs v. Goodwin*, 698 F.2d 486, 494–95 (D.C.Cir.)(stating that possession by government of confidential information is presumed detrimental to defendant), *vacated on other grounds*, 712 F.2d 1444 (1983); *United States v. Levy*, 577 F.2d 200, 210 (3rd Cir.1978)(holding prejudice need not be shown) *with United States v. Dien*, 609 F.2d 1038, 1043 (2nd Cir.1979)(holding defendants failed to show prejudice); *United States v. Davis*, 226 F.3d 346, 353 (5th Cir.2000)(holding show-

ing of prejudice required), *cert. denied,* 531 U.S. 1181, 121 S.Ct. 1161, 148 L.Ed.2d 1021 (2001); *United States v. Steele,* 727 F.2d 580, 586–87 (6th Cir.)(holding appellants failed to show prejudice), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984). Even where a presumption is applied, some courts allow it to be rebutted. *Briggs,* 698 F.2d at 495 n. 29 (noting government free to rebut presumption).

■ In our view, calling for a showing of prejudice is the better rule in light of the wide variety of circumstances under which the privilege might be breached. Moreover, such rule is consistent with our own case law. *See Cain v. State,* 947 S.W.2d 262, 264 (Tex.Crim.App.1997)(only errors that Supreme Court has designated as "structural" are categorically immune from harmless error analysis).

The evidence reflects no prejudice to appellant. The prosecutor who reviewed the privileged documents testified that he did not use any of the information in the three pages of material in preparing the case. When questioned specifically about an issue discussed at trial that appellant's attorneys identified as potentially coming from the materials, the prosecutor pointed to several other sources in which he had obtained the information:

Q. [Defense attorney] Can you point out—outside of these letters that you said that you reviewed, can you point out to any place in your investigation that made mention of hallucinations?

A. [Prosecutor] I can point to several instances.... First of all, the defendant's jail records, I've reviewed those. When he was first booked into the Dallas County Jail, he made numerous complaints of hallucinations. I've also reviewed numerous medical records from the defendant's past, various institutions, including Glen Oaks Hospital in Greenville, Texas; the Andrews Center in Tyler, Texas; Timberlawn Psychiatric Hospital in Dallas, Texas. And my recollection is in all of those documents he's made complaints about hallucinations.

Q. And, Mr. Davis, yesterday you also talked to or examined a number of witnesses regarding their knowledge or hearing of any alter ego or split personality from the defendant; is that correct?

A. Yes.

Q. And can you tell us what source, absent these letters that you reviewed, that you came across that information?

A. Glen Oaks Hospital records.

Because the proceedings were not adversely tainted by the intrusion into the attorney-client privilege, appellant is not entitled to a reversal. Point of error eleven is overruled.

■ In his twelfth point of error, appellant claims the evidence was insufficient to prove venue. At the close of the State's case, appellant sought a directed verdict on the ground that the evidence was insufficient to prove venue in Dallas County. Appellant's motion for a directed verdict was denied. The jury was charged that venue was proper in any one of the following counties:

(1) in the county in which the offense was committed, or

(2) where the property is stolen in one county and removed by the offender to another, in the county where the defendant took the property or in any other county through or into which he may have removed the same, or

(3) if a person receives an injury in one county and dies in another by reason of such injury, in the county where the injury was received or where the death occurred, or in the county where the dead body is found, or

(4) in the county in which the kidnapping offense was committed, or in any county through, into, or out of which the person kidnapped may have been taken.

However, if an offense has been committed within this State and it cannot readily be determined within which county or counties the commission took place, trial may be held in the county in which the defendant resides, in the county in which he was apprehended, or in the county to which he was extradited.

Appellant objected to the charge, arguing that venue should be limited to the county where the homicide occurred. Appellant's objections were overruled. Appellant does not complain in this appeal about the court's instructions, but alleges only that the evidence is insufficient to prove venue in Dallas County.

Under Article 13.18, if venue is not specifically stated, then the proper county for prosecution is the county in which the offense was committed. In this appeal, appellant reasons that since there is no statute specifically governing capital murder cases, Article 13.18 applies. Applicant argues that "the county in which the offense was committed" in a capital murder case should be the county in which the homicide occurred. He further argues that if venue were so restricted, the evidence would be insufficient to prove the homicide occurred in Dallas County.

The State need prove venue only by a preponderance of the evidence. Art. 13.17. We recently explained the effect and purpose of special venue provisions:

> In Texas, if the Legislature has not specified venue for a specific type of crime, then "the proper county for the prosecution of offenses is that in which the offense was committed." Special venue statutes, however, expand the number of counties in which an offense may be prosecuted. These special venue statutes have been enacted for various reasons, such as: 1) the difficulty of proving precisely where the offense was committed; 2) the location where evidence of the crime is found; 3) the effect that a crime may have upon several different counties; or 4) the effect that the actor may have upon various counties. Texas venue statutes are a species of codified "substantial contacts" jurisdiction; thus, for venue to lie, the defendant, his conduct, his victim, or the fruits of his crime must have some relationship to the prosecuting county. The Legislature has specified the types of contacts that satisfy this "substantial contacts" threshold for various offenses.

*Soliz v. State*, 97 S.W.3d 137, 141 (Tex.Crim.App.2003)(footnotes omitted). While some of the special venue statutes expressly apply to identifiable penal code offenses, other special venue provisions apply by virtue of the particular facts of the case rather than the specifically charged offense. *Compare* Art. 13.12 (applicable to false imprisonment and kidnapping prosecution); Art. 13.13 (applicable to prosecution of criminal conspiracy); Art. 13.14 (applicable when prosecuting bigamy) *with* Art. 13.01 (applicable to "offenses committed wholly or in part outside this State"); Art. 13.04 (applicable to "offenses committed on the boundaries of two or more counties, or within four hundred yards thereof"); Art. 13.06 (applicable to offenses committed on rivers or streams); Art. 13.07 (applicable in case in which victim receives injury in one county and dies in another). There is no special venue statute expressly applicable to the prosecution of a capital murder. Nor is there any statute providing that in capital murder cases, venue occurs only where the homicide takes place. Any number of the special venue provisions may apply to a

given capital murder case, depending upon its facts.

In the instant case, the victim was last seen alive in Collin County. In his confession, appellant stated that he was drinking at a bar called Bleachers. There was evidence that Bleachers Sports Grill is a bar located in Dallas County. According to his confession, appellant left Bleachers and hitched a ride with the victim "on the road beside Bleachers on [his] way to 635." Detective Myers testified that the area from Bleachers to 635 is located in Dallas County. Appellant's confession further states that appellant and the victim were driving toward 635 when he asked the victim to stop and get into the trunk, and he then shot her. The admission suggests that this occurred somewhere in the same area as the abduction—between Bleachers and 635, within Dallas County. Appellant thereafter drove around in the victim's car to various locations in Collin and Dallas Counties, using the victim's credit cards and attempting to use her ATM card. The medical examiner testified that although the gunshot wound was fatal, the victim could have lived for several minutes or longer after the shooting. The victim's body was discovered in a creek in Van Zandt County. Finally, the evidence showed that at the time of the offense, appellant's residence was in Dallas County.

■ Venue will stand if it is sufficient under any one of the venue provisions the jury was instructed upon. *Cf. Cardenas v. State*, 30 S.W.3d 384, 389 (Tex.Crim.App.2000)(holding that in capital murder case, evidence must be sufficient to prove one of disjunctively alleged underlying offenses); *Brooks*, 990 S.W.2d at 283 (stating that when jury returns general guilty verdict on indictment disjunctively charging alternative theories of committing same offense, verdict stands if evidence supports any of theories charged).

Article 13.19 provides that if an offense is committed within the state but "cannot readily be determined within which county or counties the commission took place," trial can be held in the county in which the defendant resides, the county where he is apprehended, or the county to which he is extradited. This provision was made a part of the trial court's charge. Given the difficulty of determining exactly where the offense occurred, a rational jury could have relied on this provision and concluded venue was proper in Dallas County, the county of appellant's residence. Point of error twelve is overruled.

■ In his thirteenth point of error, appellant claims the trial court abused its discretion by denying appellant's request during the punishment phase of the trial to suppress an out-of-court photographic identification of appellant made by Sherryl Wilhelm, in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution. Wilhelm testified at a hearing outside the presence of the jury that in August of 1997, she went out to her car on lunch break while working at Arlington Memorial Hospital. When she opened her car door, a man pushed her from behind and followed her into the car. Wilhelm made several attempts to open the passenger door until the man started to choke her. He ordered her onto the floor board with her face down in the seat, while he drove out of the parking lot. Wilhelm gradually worked her way upright onto the passenger seat and was allowed to sit up. When the car slowed down at a traffic light, Wilhelm jumped out and rolled onto the street. She received help from another motorist. She described her abductor as white, clean-cut with a short haircut, an earring, a five-o'clock shadow, slender build, medium to tall height and in his early twenties. Wilhelm said there was nothing obscuring

his face and she was in the car with him for approximately thirty minutes. Douglas H. Ligon, a police officer trained in producing composite sketches, worked with Wilhelm in composing a drawing of her abductor. Ligon testified that Wilhelm also described the man as having dark hair and being olive-complected. In October 2000, while watching a television news report about the instant case, Wilhelm saw a composite drawing of the suspect for this offense and recognized him as the same man who had abducted her. She contacted Detective John Stanton, of the Arlington Police Department, who had investigated her case earlier.

Detective Stanton testified that he put together a lineup of six photos, including appellant's picture, for Wilhelm to view. He told Wilhelm that the suspect might or might not be in the lineup, and that it wasn't necessary for her to choose anyone. He testified that when Wilhelm viewed photo number five, appellant's photo, she stopped and there was a visible change in her demeanor. Stanton stated that Wilhelm said, "oh my God, I'm—I'm virtually sure . . ." and that her voice was quivering. Stanton asked her if she was sure and she said she was as sure as she could be after this amount of time. Although appellant now asserts a number of reasons why the photo lineup was not reliable, at trial he objected solely on the ground that the photo lineup appeared to be made up of individuals of "different races."

Because appellant objected solely on this basis, we will address the reliability of the lineup on this ground alone. The race of the suspects in the lineup is not stated in the record. However, we have reviewed the photo lineup, and all of the suspects appear to be similarly-complected. All of the suspects have short dark hair, slight facial hair, dark eyes, and are all about the same age. All suspects are shown from the neck up. Stanton testified that he was able to modify the photos by computer so that they all appeared similar in size, position, and background. None of the suspects stands out as apparently of a different race from the other suspects. The trial court did not abuse its discretion in overruling appellant's objection to the reliability of the lineup on the basis of race. Point of error thirteen is overruled.

In his fourteenth point of error, appellant claims the trial court abused its discretion in denying his request for a jury instruction that would have required the jury to consider extraneous offenses only for the purpose of determining the future dangerousness special issue. This argument has been addressed and rejected previously. *Jackson v. State*, 992 S.W.2d 469, 478 (Tex.Crim.App.1999). Point of error fourteen is overruled.

In point of error fifteen, appellant claims the trial court erred at punishment in failing to submit to the jury definitions of the terms "probability," "criminal acts of violence," and "continuing threat to society." Appellant argues that without definitions for these critical terms, the statutory aggravating circumstances are not adequately narrowed, and the jury's verdict is not rationally reviewable. This Court has repeatedly held that these terms are not unconstitutionally vague and the jury is presumed to understand them without an instruction. *Feldman v. State*, 71 S.W.3d 738, 757 (Tex.Crim.App.2002); *Ladd v. State*, 3 S.W.3d 547, 572 (Tex. Crim.App.1999), *cert. denied*, 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000). Point of error fifteen is overruled.

In his sixteenth point of error, appellant claims the Texas death penalty scheme violated his rights against cruel and unusual punishment and to due process of law under the Eighth and Four-

teenth Amendments to the United States Constitution by requiring at least ten votes for the jury to return a negative answer to the future dangerousness special issue and to return an affirmative answer on the mitigation issue. We have addressed this issue and upheld this scheme as constitutional. *Prystash v. State,* 3 S.W.3d 522, 536–37 (Tex.Crim.App.1999)(citing numerous cases in support), *cert. denied,* 529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000). Point of error sixteen is overruled.

 In point of error seventeen, appellant claims the Texas death penalty scheme denied appellant due process of law, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution because of the impossibility of simultaneously restricting the jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence mitigating against the imposition of the death penalty. Appellant relies solely on Justice Blackmun's dissent from the United States Supreme Court's denial of certiorari in *Callins v. Collins,* 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994)(Blackmun, J., dissenting). We have addressed and rejected identical claims. *Ladd,* 3 S.W.3d at 575. Point of error seventeen is overruled.

In point of error eighteen, appellant makes the same claim under Article I, sections 13 and 19 of the Texas Constitution, that he asserts in point of error seventeen. Because appellant does not argue that the Texas Constitution provides or should provide any different or greater protection in this regard, appellant fails to adequately brief this claim. TEX.R.APP. PROC. 38.1(h). Point of error eighteen is overruled.

In points of error nineteen and twenty, appellant claims the cumulative effect of the above enumerated constitutional violations denied him due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution, and due course of law under Article I, section 19 of the Texas Constitution. Because we have found little or no error in the above-alleged points, there is no harm or not enough harm to accumulate. Points of error nineteen and twenty are overruled.

The judgment of the trial court is affirmed.

KELLER, P.J., concurred in the result with respect to Point of Error Number Three and otherwise joined the opinion of the Court.

JOHNSON, J., filed an opinion, in which WOMACK and COCHRAN JJ., joined, that concurred in the result with respect to Points of Error Numbers Seven and Eight and otherwise joined the opinion of the Court.

JOHNSON, J., filed a concurring opinion in which WOMACK and COCHRAN, JJ., joined.

I join the opinion of the Court except as to points of error seven and eight and concur in the judgment of the Court as to those points.

In a capital murder trial in which the state seeks the death penalty, Texas law requires jurors to determine whether "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. . . ." Only if all jurors believe that the defendant will continue to be a danger can the trial court assess the death penalty. TEX.CODE.CRIM. PROC., art. 37.071, §§ 2(b)(1) and 2(d)(2). Thus, it is imperative that jurors understand the difference between "probable" and "possible."

While it is possible that I will win the lottery, it is not probable; indeed, it is

highly improbable. There are several reports of people who receive mailings from Publishers Clearinghouse that say that they "may already be a winner" and, confusing possibility and probability, begin to spend as if they have won millions. For them, the inability to distinguish between "probable" and "possible" has a financial cost.

If a juror confuses "probable" and "possible" and also believes that there is a small chance that the defendant might commit violent acts in the future, even if that juror also believes that another violent act is unlikely, that juror may feel compelled to find that the defendant is a future danger. If that juror is also the twelfth vote, the cost of that confusion is the defendant's life.

In *Hughes v. State*, 878 S.W.2d 142, 148 (Tex.Crim.App.1992), this Court stated that a prospective juror who cannot distinguish between probable and possible is properly challengeable for cause and that the trial court abused its discretion in denying such a challenge. Too, the legislature was very specific when it promulgated the procedures for assessing the death penalty, and this Court is bound by those procedures. The legislature required "probability," and so must this Court.

In this case, two jurors appear from the record to be unable to distinguish "probability" and "possibility." Brooks stated that the probability is " 'a chance,' " while Williams "continued to reiterate that she believed probability and possibility mean the same thing." *Murphy v. State*, op. at ——, *supra*. Under *Hughes*, both Brooks and Williams were properly challengeable, and the trial court abused its discretion in denying appellant's challenges to them.

The next issue is harm. Although I would find an abuse of discretion as to both Brooks and Williams, neither served on the jury, and appellant has not com-plained that he has suffered harm by the need to expend peremptory challenges. He has therefore failed to establish harm, and I would find that the error in denying his challenges for cause was harmless.